IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION


SARA CHAISSON                                                                    PLAINTIFF

          v.                              Civil No. 14-5296

SHERIFF TIM HELDER, Washington
County, Arkansas, in his official capacity
only; SERGEANT WHITTINGTON;
OFFICER COTTLE; OFFICER WALLACE;
DEPUTY JILL JOHNSON; and DEPUTY
CAULEEN JOHNSON                                                                  DEFENDANTS


**<u>REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE</u>**

     This is a civil rights case filed by the Plaintiff pursuant to 42 U.S.C. § 1983.  Plaintiff

proceeds *pro se* and *in forma pauperis.*

     Plaintiff is incarcerated in the Federal Correctional Institution in Tallahassee, Florida.

When she filed this action, Plaintiff was incarcerated in the Washington County Detention

Center (WCDC) in Fayetteville, Arkansas.  Plaintiff maintains her constitutional rights were

violated when the Defendants failed to protect her from attack by fellow inmates.

     Defendants filed a Motion for Summary Judgment (Doc. 36).  A hearing was scheduled

for March 14, 2016, to allow the Plaintiff to testify in response to the Motion.  At the beginning

of the hearing, Plaintiff requested that her deposition, which was submitted as an exhibit, be used

as her version of the facts of the case.  Her request was granted.  The Motion is ready for

decision.

-1-

**1.  Background**

Plaintiff was booked into the WCDC on August 21, 2014.  *Defendants' Exhibit* (herein

after *Defts' Ex.*) B at 28.[1]  She remained housed there until November 4, 2014.  *Id.* at 89-91.

Plaintiff was placed in Y-pod, which was an open barracks pod.  *Defts' Ex.* B at 26, 43.

Jamie Pratt was an inmate assigned to Y-pod.  *Id.*  Plaintiff testified that she and Pratt were

friends when they were in the "free world" and she "would have never thought [Pratt] was going

to attack [her]."  *Id.* at 26, 28.

At approximately 2:00 or 3:00 a.m. on August 22nd, Pratt assaulted the Plaintiff.  *Defts'*

*Ex.* at 26-28.  At the time, Plaintiff was on her bunk.  *Id.* at 30.  Pratt came up behind her and

started striking Plaintiff in the back of the head with her fist, "grabbed [Plaintiff] by the hair and

was hitting [her] in the face and trying to pull [her] off the top bunk."  *Id.* at 31-32, 41.  Plaintiff

did not strike Pratt.  *Id.*  Other inmates pulled Pratt off of the Plaintiff.  *Id.*   The attack lasted

only a few seconds and after it was over,  Pratt was screaming at Plaintiff and stated that she was

mad at her.  *Id.* at 29-30, 40.

Plaintiff testified that she had a knot on her head, her eye was "kind of blacked," and her

"hair was falling out really bad" for approximately two weeks from it being pulled so hard.  *Id.*

at 31.  Plaintiff did not seek medical care.  *Id.*   Although she has a thyroid condition, Plaintiff

did not believe her hair falling out at this time was related to the condition.  *Defts' Ex.* B at 50.

On September 12, 2014, Plaintiff filed a grievance, stating that her hair was falling out and she

thought it was related to her thyroid.  *Id.*  Plaintiff testified she was stretching the truth because

---

[1]Page references are to the deposition page numbers found in the upper right hand corner of the deposition.

"medical there sucked" and she was trying to be seen by Dr. Mullins to get her thyroid medication adjusted. *Id.* at 50-51.

Plaintiff initially testified that she believed the attack probably had something to do with drugs. *Id.* at 30. She indicated both she and Pratt used methamphetamine. *Id.* Plaintiff then testified Pratt could have been mad because Plaintiff was "pretty rude to her on the street" when they were both talking to a mutual male friend. *Id.* at 28-29.

Plaintiff did not seek help at the time the attack occurred, instead, she stayed on her bunk and tried to sleep. *Defts' Ex.* B at 37. Plaintiff testified that the next day she was called out of the pod to meet with drug task force officers about her criminal charges. At that time, she reported the attack to the task force officers, but they just kind of "pushed it off." *Defts' Ex.* B at 32-33 & 39. Plaintiff explained that she did not report the assault earlier in the day because she was scared and did not want to report it in front of the whole pod. *Id.* at 38. Plaintiff testified that she also reported the assault to Officer Cottle when she was taking the Plaintiff to meet with the task force officers. *Defts' Ex.* 1 at 30-33, 38 & 41. Plaintiff testified she made it clear to Cottle that she had been attacked. She also noted that she had a bruise on her eye and you could tell she had been hit in the face. *Id.* Plaintiff believed she identified Pratt as the attacker, but was not one hundred percent sure. *Id.* at 37.

Officer Wallace, who was on duty that evening from 5:45 p.m. until 6:00 a.m., did not recall there being any fight that night and no fight was reported to her. *Defts' Ex.* D. Officer Cottle stated that she did not escort Plaintiff to meet with the drug task officers but did pick her up from the interview. *Defts' Ex.* C at ¶ 5. Prior to picking Plaintiff up, Officer Cottle had heard some talk about a possible altercation the night before. *Id.* at ¶ 6. Before she could determine

who was involved in the fight, Officer Cottle was called out of the pod to go and escort the Plaintiff back to the pod. *Id.* Officer Cottle did not know the altercation was allegedly between Plaintiff and Pratt. *Id.*

According to Officer Cottle, when she picked the Plaintiff up, she asked her about the altercation. *Defts' Ex.* C at ¶ 7. Officer Cottle indicated that she specifically told the Plaintiff she needed to know who was involved so she could do something about it. *Id.* Officer Cottle indicated that Plaintiff refused to give her any details and told her that it was "no big deal." *Id.*

Neither Officer Cottle nor Officer Wallace saw a black eye, a bruise, or any other mark on Plaintiff's face. *Defts' Ex.* C at ¶ 8; *Defts' Ex.* D at ¶ 13. While Plaintiff's hair was messy, no knot on her head was observed and neither saw any hair falling out. *Defts' Ex.* C at ¶ 9; *Defts' Ex.* D at ¶ 13. Plaintiff did not report any injuries to Officer Cottle. *Id.* Both Officers Cottle and Wallace denied that Plaintiff reported that Pratt assaulted her; had she done so, the officers indicated they would have, at a minimum, removed one of the inmates from the pod and completed an incident report. *Defts' Ex.* C at ¶ 10; *Defts' Ex.* D at ¶ 11. There is no report of an altercation between Pratt and the Plaintiff on August 22nd. *Defts' Ex.* A at ¶ 9.

Officer Cottle stated that she was in the pod regularly and never heard of, or observed, any problems between the Plaintiff and other inmates. *Defts' Ex.* C at ¶ 12. Further, she stated that she was not aware of any assault or threat to Plaintiff's safety at anytime until she returned to work after Plaintiff was in a subsequent fight on September 4th. *Id.* at ¶ 14. No guards or inmates told Officer Wallace about the altercation between Plaintiff and Pratt on August 22nd. *Defts' Ex.* D at ¶¶ 8-9. Officer Wallace and Sergeant Whittington asserted that they were not

-4-

aware of any assault on the Plaintiff prior to the September 4th fight.  *Id.* at ¶ 10; *Defts' Ex.* E at ¶ 8.

Deputies Jill Johnson and Cauleen Johnson asserted by affidavits that they were unaware of any assault on the Plaintiff by Pratt.  *Defts' Ex.* F at ¶ 9; *Defts' Ex.* G at ¶ 9.  Had Plaintiff reported such an attack, the deputies stated that, at a minimum, they would have separated the two inmates.  *Id.*

Plaintiff stated that despite the attack, Pratt was left in the same pod with the Plaintiff. *Defts' Ex.* B at 27.  Plaintiff  moved her bunk to another bed that was available and, after that, everything seemed to be okay until "a couple of days before the incident happened in September."  *Id.* at 43.  According to Plaintiff, that is when Pratt and another inmate, Sharone Etherton, "started their stuff again, bullying people and all that . . . ."  *Id.*  According to Plaintiff, she and at least two other inmates advised both Deputy Jill Johnson and Deputy Cauleen Johnson about the conduct of Pratt and Etherton.  *Defts' Ex.* B at 43-44.  Specifically, they advised the deputies that Pratt and Etherton were "bullying on people, hitting on people, [and] verbally abusing people."  *Id.* at 44.  When asked at her deposition how Pratt and Etherton were being verbally abusive, Plaintiff explained, "They were talking down to others, cussing them out, they were taking people's trays from them."  *Id.* at 46.

As to how Pratt and Etherton acted toward Plaintiff in particular, Plaintiff  testified that they called her names and "all kinds of stuff," but they never took her tray and she never reported anything about Etherton threatening or striking her until after the September 4th incident.  *Id.*  Plaintiff explained that while she "probably didn't specify that they were threatening [her]" in particular, "I made it aware to the officers that they were threatening

-5-

everybody in the unit . . . and that people didn't feel safe there, like when I spoke, I didn't just speak for others.  I was speaking for myself as well."  *Id.* at 47-48.  Plaintiff testified that nothing was done in response to her and the other inmates' verbal complaints.  *Id.* at 44-45.

Plaintiff was "kind of" familiar with the WCDC grievance policy.  *Defts' Ex.* B at 34-35. She did not believe that she submitted a grievance about the August 22nd fight.  *Id.* at 35-36. Because she reported the fight to the officers, she "didn't know that [she] needed to go ahead and put in a grievance about the fight." *Id.* at 36.  Additionally, Plaintiff testified that the grievances did not stay confidential, and she was "a little scared to put in a grievance." *Id.*

At some point, Plaintiff became aware of the fact that she needed to put grievances into the kiosk system.  *Defts' Ex.* B at 35.  She believed another inmate told her about it.  *Id.* Defendants' records indicate Plaintiff submitted her first request via the electronic kiosk on August 23rd.  *Defts' Ex.* B at 35.  Plaintiff was asking about her holds and bonds.  *Defts' Ex.* A-1 at 119.   Plaintiff submitted multiple requests/grievances unrelated to any problems with Pratt or Etherton from August 24th to September 4th.  *Defts' Ex.* A-1 at 42-50.  Plaintiff testified that she did not put in a grievance because everyone told her that the inmates always found out who submitted it.  *Id.* at 49.

As to the incident that occurred on September 4th, Plaintiff testified that Pratt started a fight with another inmate, Amber Tharp.  *Defts' Ex.* B at 27, 45 & 50; *Defts' Ex.* A-1 at 34-37. Etherton then went looking for the Plaintiff and jumped the Plaintiff while she was using the bathroom.  *Id.*  at 27, 34.  Etherton took the Plaintiff's wrist and repeatedly hit it over a brick divider.  *Id.*  Plaintiff stated that the fight lasted about a minute.  *Id.* at 58.  It was broken up by

another inmate. *Id.* at 58-59. The entire fight was over before the deputies made it to the pod. *Id.* at 58. When the deputies entered, Plaintiff was over by her bunk. *Id.*

Tharp and the Plaintiff were taken to the hospital. *Defts' Ex.* B at 27. Tharp ended up with a concussion and she was sent to the hospital. *Defts' Ex.* B at 45. It was suspected that Plaintiff had a fractured wrist. *Defts' Ex.* A at 35. Plaintiff's wrist was put in a brace that she had to wear for a few weeks. *Defts' Ex.* B at 71-72; *Defts' Ex.* A-1 at 35-37.

On September 5th, Sergeant Whittington submitted an incident report. It stated that on September 4th at approximately 9:54 p.m.:

> a fight broke out in Y-Block. Deputy Terry Corkern and Deputy Jill Johnson responded to the fight. I arrived a few minutes later. The females in the block had broken up the fight and 2 females were injured. Detainees injured were Amber Tharp and Sara Chaisson. Detainee Tharp could not focus and began to vomit. Detainee Chaisson had an injury to her right wrist. The wrist had already turned blue and looked to be broken. The aggressors were Schrone [sic] Etherton and Jamie Pratt. After moving the 2 aggressors to H-block, Chaisson and Tharp were transported to the WRMC hospital.
>
> Review of the video revealed that Jamie Pratt attacked Amber Tharp and beat her head on the concrete floor. Other detainees were trying to break up the fight. Sara Chassion was in the bathroom and tried to step around Schrone [sic] Etherton. At this point Etherton pushed Chaisson into the corner of the bathroom resulting in the injury to Chassion's right wrist.
>
> The result of the hospital visit for Sara Chaisson is fracture of the right wrist and she has been referred to an orthopedic surgeon.
>
> The result of a hospital visit for Amber Tharp is a concussion.

*Defts' Ex.* A-1 at 38. Deputy Jill Johnson and Deputy Corkern also submitted incident reports. *Defts' Exs* A-1 at 39-40. Officer Wallace was on vacation at the time of this fight. *Defts' Ex.* D at ¶ 16.

-7-

Plaintiff alleges the Defendant officers took way too long to respond to the fight. *Defts'*
*Ex.* B at 28. She maintains "they kept leaving the same women in the unit after it was told to
them numerous times they were bullying, threatening people; and they just failed to keep me and
other inmates safe." *Id.* Plaintiff could not recall if she ever filed a grievance about the second
fight or about needing to be moved from the pod. *Deft's Ex.* B at 50.

Following the September 4th attack, Plaintiff, Tharp, Etherton, and Pratt were all moved
to H-pod. *Defts' Ex.* B at 27. They were in the same unit but were locked down in different
cells. *Id.* Plaintiff testified that Pratt and Etherton were constantly screaming at her and Tharp
and threatening them when they were housed in H-pod together after the September 4th fight.
*Id.* Plaintiff testified that she felt threatened by them and was scared to be around them. *Id.* at
55-56. Plaintiff acknowledged, however, that she did not have recreation with Pratt or Etherton
or come out at the same time for showers and that there was no way they could reach her. *Id.*

On September 5th, Plaintiff submitted a request stating she would like to get out of
holding and go back to Y-pod. *Defts' Ex.* A-1 at 128. Nurse Vickery replied that she would have
Nurse Bradley check her the following day. *Defts' Ex.* A-1 at 128. Deputy Carter also
responded saying she would have to be medically cleared and that she was being housed in
holding for her own safety so she did not get further injured. *Id.* On September 9th, Plaintiff
was seen by Dr. Mullins and he approved the removal of the splint from her right wrist. *Defts'*
*Ex.* A-1 at 95.

Beginning on September 5th, Plaintiff submitted a number of inmate requests about the
following: her medical clearance; a medical mattress; dental problems; her orthopedic
appointment; the need for certain addresses; a form and legal envelopes; charges to her

-8-

AO72A
(Rev. 8/82)

commissary account; the need to have certain forms filled out; her hair loss; her court dates; a marriage application; trustee status; and a disrespectful nurse. *Defts' Ex.* A-1 at 128-136.

By affidavit, Corporal Mulvaney indicated that it is the policy and practice of the WCDC that "deputies are to watch the cameras and walk the pods to make sure that everything is ok during the night." *Defts' Ex.* A at ¶ 4. Deputies are to respond "to emergency situations including fights among inmates as quickly and safely as possible by stopping the event and then rendering basic aid and contacting medical and emergency personnel if necessary. *Id.* at ¶ 5.

According to Corporal Mulvaney, inmates may report an assault or threat to their safety in person or by the electronic kiosk system in place for requests and grievances. *Defts' Ex.* A at ¶ 6. Pursuant to policy, if a deputy becomes aware of a potential security problem to, or between, inmates (by any means), they should investigate the problem and report to the supervisor for a decision on matters such as housing and discipline. *Id.* at ¶ 7. Deputies should immediately separate inmates who are involved in an altercation or who present an apparent or immediate risk of trouble. *Id.*

Corporal Mulvaney indicated that they can best protect an inmate if the inmate identifies the inmate who she believes poses a risk to her safety. *Defts' Ex.* A at ¶ 8. According to Corporal Mulvaney, "merely saying an inmate is 'causing problems' (but not presenting a threat of danger/altercation/injury) is not a sufficient reason to make a housing change due to limited housing options." *Id.* He indicated the detention center is not large enough to separately house all inmates about whom another inmate complains. *Id.*

Corporal Mulvaney contended they first became aware of the alleged August 22, 2014 incident when they were served with the complaint on March 4, 2015. *Defts' Ex.* A at ¶ 10. By

that time, in accordance with standard usage, the video from August 22, 2014, had already been taped over. *Id.* If Plaintiff had reported an assault on August 22nd, an incident report would have been written, either Plaintiff or the alleged offender moved, and the report could also have triggered a review and preservation of any video footage. *Id.* at ¶ 11.

As to the basis for liability of each of the named Defendants, Plaintiff explained that she did not believe Sheriff Helder trained his employees to handle situations properly. *Defts' Ex.* B at 51-52. By way of example, Plaintiff noted that it took detention personnel forever to respond and they kept housing the Plaintiff, Pratt and Etherton together. *Id.* Plaintiff never personally saw Sheriff Helder and never talked to him about her situation. *Id.* at 52. She named him as a defendant because he is in charge of the jail. *Id.*

With respect to Sergeant Whittington, Plaintiff testified she took "forever to respond back ... whenever the fight broke out, and then she houses . . . us altogether [sic] back in H unit." *Defts' Ex.* B at 54-55. It took a couple minutes for Sergeant Whittington to respond. *Id.* at 57. Another inmate had to push the intercom button numerous times. *Id.*

With respect to Officer Cottle, Plaintiff testified she made her aware of the August 22nd attack, but Officer Cottle never did anything about it. *Defts' Ex.* B at 59.

With respect to Officer Wallace, Plaintiff testified she was one of the officers that worked the night of the August 22nd fight and she had been told about Pratt and Etherton being aggressive in the unit, verbally talking down to people, and talking about past acts of violence. *Defts' Ex.* B at 60.

-10-

With respect to Deputy Jill Johnson and Deputy Cauleen Johnson, Plaintiff testified that she informed them a couple of days before the September 4th incident about Pratt and Etherton bullying, verbally abusing, and threatening other inmates in the pod. *Id.* at 64.

### 2.  Applicable Standard

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." National Bank of Commerce v. Dow Chemical Co., 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." National Bank, 165 F.3d at 607 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." Id. (citing Metge v. Baehler, 762 F.2d 621, 625 (8th Cir. 1985)).

### 3.  Discussion

Defendants contend they are entitled to judgment in their favor on the following grounds: (1) Plaintiff failed to exhaust administrative remedies; (2) Defendants were not deliberately

-11-

indifferent to Plaintiff's safety; (3) Defendants are entitled to qualified immunity; and (4) there is no basis for official capacity liability.

### (A).  Exhaustion of Administrative Remedies

The Prison Litigation Reform Act ("PLRA") mandates exhaustion of available administrative remedies before an inmate files suit.  Section 1997e(a) of the PLRA provides: "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).

"[T]o properly exhaust administrative remedies prisoners must complete the administrative review process in accordance with the applicable procedural rules."  Jones v. Bock, 549 U.S. 199, 218 (2007)  (internal quotation marks and citation omitted).  The "level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion."  Id.

Defendants argue that Plaintiff failed to exhaust her administrative remedies because she did not file a grievance about any perceived threat to her or about the altercations on August 22nd or September 4th.  Defendants submit as an exhibit to their summary judgment motion the WCDC's policy outlining an inmate's right to file a grievance and the procedures to follow. *Defts' Ex. A-2* at 10.  While Plaintiff did not file a grievance, she maintains that she reported the August 22nd attack verbally to Officer Cottle.  With regard to the September 4th attack, various deputies became aware of it and completed incident reports about it.

-12-

Corporal Mulvaney indicates in his affidavit that an "inmate may report an assault or threat to their safety in person or by the electronic kiosk system in place for grievances and requests." *Defts' Ex.* A at ¶ 6. Viewing Corporal Mulvaney's statement and the other facts in the light most favorable to the Plaintiff, as the Court must do for summary judgment purposes, Defendants are not entitled to summary judgment on the exhaustion issue, as there is an issue of fact as to whether Plaintiff satisfied the WCDC's exhaustion requirement by verbally reporting the attacks. The undersigned would note that permitting an inmate to verbally report a threat or assault rather than follow the written grievance procedure makes sense. It is important that assaults and threats be reported as quickly as possible. Requiring submission of a grievance would slow response time and potentially further jeopardize the safety of an inmate.

**(B). Failure to Protect**

Prison officials have a duty, under the Eighth Amendment, to protect prisoners from violence at the hands of other prisoners. See Perkins v. Grimes, 161 F.3d 1127, 1129 (8th Cir. 1998). However, not "every injury suffered by one prisoner at the hands of another . . . translates into constitutional liability for prison officials responsible for the victims's safety." Farmer v. Brennan, 511 U.S. 825, 834 (1994).

To prevail on her failure to protect claim, Plaintiff must satisfy a two prong test: (1) show she was "incarcerated under conditions posing a substantial risk of serious harm;" and (2) the prison officials were "deliberately indifferent [to her] health or safety." See Holden v. Hirner, 663 F.3d 336, 341 (8th Cir. 2011) (internal citations omitted). The first prong is an objective requirement to ensure the deprivation is a violation of a constitutional right. *Id.* The second, however, is subjective requiring Plaintiff show the official "both knew of and

-13-

disregarded 'an excessive risk to inmate health or safety.'" *Id*. (quoting Farmers, 511 U.S. at 837).

"An official is deliberately indifferent if he or she actually knows of the substantial risk and fails to respond reasonably to it." Young v. Selk, 508 F.3d 868, 873 (8th Cir. 2007). Negligence alone is insufficient to meet the second prong, instead, the official must "recklessly disregard a known, excessive risk of serious harm to the inmate." Davis v. Oregon County, 607 F.3d 543, 549 (8th Cir. 2010) (internal quotation marks and citation omitted).

After careful review of the record, I conclude Defendants are entitled to summary judgment on this claim. Plaintiff has not provided evidence that she was incarcerated under conditions posing a substantial risk of harm or that any of the Defendants knew of and disregarded an excessive risk to her health or safety. Prior to the alleged August 22nd attack, Plaintiff had only been in the WCDC for a few hours; she had not indicated she had any enemies in the detention center; and Plaintiff herself testified that she did not know that she was at risk of being assaulted by Pratt, who she described as a friend. Defendants could not have known that Pratt presented a serious risk of harm to the Plaintiff.

Following the August 22nd attack, Plaintiff contends she informed Deputy Cottle of the incident, but she acknowledges that she is not sure that she identified Pratt as her attacker. Deputy Cottle contends that she had heard some talk about an altercation and asked Plaintiff about it, but Plaintiff refused to give her any details, including who was involved, and stated that it was "no big deal." No incident report or other written record exists of the attack. Plaintiff did not ask to be moved, seek medical care, or report that she felt threatened by Pratt. Most importantly, while the undersigned can certainly understand Plaintiff's concern about

-14-

continuing to be housed in the same pod as Pratt after the attack, Pratt never assaulted Plaintiff again, and thus, Defendants cannot be said to have knowingly disregarded an excessive risk of harm to Plaintiff by not moving Pratt.

The incident that occurred on September 4th involved a different inmate, inmate Etherton. Even if we assume that Plaintiff did report the August 22nd attack by Pratt, Plaintiff acknowledged that after this attack, she moved her bunk and everything seemed to be okay until just a couple of days before the September 4th attack. It was not until just a couple of days before the attack that Plaintiff indicates she advised Deputy Jill Johnson and Deputy Cauleen Johnson that Pratt and Etherton were bullying, hitting, verbally abusing other inmates and also taking their trays. Plaintiff acknowledged, however, that she did not report anything about Etherton threatening or harassing her in particular. There is nothing in the record suggesting that Etherton had a prior documented history of violent conduct and nothing documenting that any other inmate ever reported a specific threat or episode of violence by Etherton.

The undersigned certainly empathizes with the Plaintiff and perhaps it would have been advisable for jail officials to look into the situation when Plaintiff reported it two days before the attack. However, the undersigned cannot say that the failure to immediately investigate Plaintiff's generalized statements about Etherton's bullying and harassing behavior constituted a knowing disregard to a substantial risk of serious harm to the Plaintiff. A general risk of violence that is inherent in prison life is insufficient. See e.g., Baker v. Pettis Cty. Jail, No. 06-4092-CV-C-NKL, 2007 WL 4289693, *7 (W.D. Mo. Nov. 28, 2007) (granting summary judgment to defendant jail officials on inmate's failure to protect claim; the reality is that

-15-

inmates in a jail do not always get along and, therefore, generalized statements by an inmate, over a period of less than a week, that he was not getting along with other inmates and that they had harassed and threatened him failed to allege sufficient knowledge of a risk of serious harm); Kitchen v. Miller, No. 2:04CV21DDN, 2005 WL 34334382, *4 (E.D. Mo. Dec. 13, 2005) (granting summary judgment to defendant jail officials on inmate's failure to protect claim where plaintiff never complained about threats from his attacker and, at most, jail officials had notice that the attacker was bullying other inmates and taking their food trays; there was no prior violent conduct by attacker that would have put the jail officials on notice that he posed a risk of serious harm to the plaintiff); Shaffer v. Reno, No. 94-2033, 1995 WL 555018, *4-5 (7th Cir. Sept. 13, 1995) (affirming district court's grant of summary judgment for defendant jail officials; mere fact that certain inmates sometimes took food trays from others, controlled the public telephone, and bullied other inmates did not amount to a pervasive risk of harm).

Finally, given that the altercation lasted no more than a minute, it is not possible to draw an inference that there was anything about the alleged delay in response time that might support an Eighth Amendment claim. Defendants are entitled to summary judgment on the individual capacity claims.

**(C). Qualified Immunity**

Having found that the facts do not make out a constitutional violation, Defendants are entitled to qualified immunity in their individual capacities. See, e.g. Krout v. Goemmer, 583 F.3d 557, 564 (8th Cir. 2009) (unless the facts make out a violation of a constitutional right, the Defendant is entitled to qualified immunity).

-16-

AO72A
(Rev. 8/82)

**(D).  Official Capacity Claims**

Here, Plaintiff's official capacity claims are based on the alleged inadequacies in the WCDC's procedures following complaints of an assault by another inmate.  A Plaintiff "seeking to impose liability on a municipality under § 1983 [must] identify a municipal policy or custom that caused the plaintiff's injury."  Board of County Commissioners of Bryan County, Oklahoma v. Brown, 520 U.S. 397, 403 (1997).  "There are two basic circumstances under which municipal liability will attach: (1) where a particular municipal policy or custom itself violates federal law, or directs an employee to do so; and (2) where a facially lawful municipal policy or custom was adopted with 'deliberate indifference' to its known or obvious consequences."  Moyle v. Anderson, 571 F.3d 814, 817-18 (8th Cir. 2009) (citation omitted).

Plaintiff has not pointed to "any officially accepted guiding principle or procedure that was constitutionally inadequate."  Jenkins v. County of Hennepin, 557 F.3d 628, 633 (8th Cir. 2009).  Merely alleging that procedures were not followed or were inadequate in some way is insufficient.  *Id.*   Plaintiff has not pointed to a "deliberate choice of a guiding principle or procedure made by the municipal official who has final authority in such matters."  *Id.*

"[A] custom can be shown only by adducing evidence of a continuing, widespread, persistent pattern of unconstitutional misconduct."  *Id.* at 634 (internal quotation marks and citation omitted).  There is no genuine issue of material fact as to whether there is any widespread, persistent pattern of unconstitutional conduct with respect to the procedures following after an assault has occurred.  Plaintiff has pointed to only the two attacks against her made by two different inmates.  Defendants are entitled to summary judgment on the official capacity claims.

-17-

**4.  Conclusion**

For the reasons stated, I recommend that Defendants' Motion for Summary Judgment (Doc. 36) be **GRANTED and the CASE DISMISSED WITH PREJUDICE.**

**The parties have fourteen (14) days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 27th day of July 2016.


/s/ *Erin L. Setser*
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE

-18-